Let's call the third case 20-1131, Ibrahim v. Alliance for Sustainable Nrg, and for the appellant is Mr. Moretta. You may proceed. Good morning. May it please the court, I am David Moretta, attorney registration 44409. It is my privilege to represent the appellant, Dr. Irfan Ibrahim, in this appeal. There are several issues on which I plan to primarily focus this morning. The first issue is the district court's abuse of discretion in finding that CB was not a reasonably situated comparator. Second issue is the district court's failure to properly apply Rule 56 standards. Third issue is the numerous ways in which Dr. Ibrahim met his de minimis prima facie burden, as well as his burden of demonstrating pretext. I welcome any questions that the court may have on these or other issues as well. Your Honor, the first issue that... On the issue of comparator, that's your first issue, I take it? Yes, Your Honor. At the trial level, whose burden is... Not burden, but who's the decider of comparator? Is it the judge or the jury? Your Honor, I think that the judge only has the initial screening function to determine whether the plaintiff has satisfied his burden of production on that issue. Ultimately, the jury would decide whether this Caucasian manager was in fact similarly situated in a proper comparator. I believe, Your Honor, that this issue compels reversal of the district court's grant of summary judgment in this matter. The fact is that we have met all the elements of the standard articulated in Smothers, another case law of this court, essentially that my client was treated differently than other similarly situated, non-protected employees who violated rules of comparable seriousness. There appears to be no dispute that the district court... Is it enough here that there's just one potential comparator? Is that enough to get this case to a jury? Yes, it is, Your Honor, because it shows the disparity. It shows the differential treatment that my client received versus a Caucasian manager who violated work rules of comparable seriousness. Was it your client, though, a much more senior management position than the potential comparator? Only in name, Your Honor. You'll see from the record that my client, in fact, was demoted several months before these incidents arose, and he, in fact, was only a research advisor at the time. He ended up acting center director. That's correct, but his title, his actual role is research advisor, Your Honor, and the issue is not the title that he held, but the fact that there were overlapping decision makers who made the sub-decisions with respect to Dr. Abraham as well as CB, the Caucasian comparator. Now, there appears to be no dispute... I'll go back to Chief Judge Timcovich for a minute. In a large organization like the Alliance and the center up in Boulder, there's lots and lots of decisions that are made. If there's one comparator in a fairly large organization, is that enough, or is there any kind of a requirement for more than just one decision that seems to be different than others? I appreciate the question, Your Honor. I've seen nothing in the case law that indicates anything with regard to numerosity of the similarly situated comparators. What I would say is that in this case, the substantial similarities in the issues that involved in the allegations against my client as well as those against the Caucasian manager cannot go unnoticed in this case. Both involved text messaging with female employees of the company. In the case of the Caucasian manager, that female employee was a direct subordinate of his. And those text messages, as we've described, involved quite graphic content. He was also noted by other employees as making sex-based comments about women versus... The similarities are very strong. In fact, if anything, the comparator may have been worse in that. But there are these two differences that Ibrahim had further objectionable conduct after being warned, and number two, that he had a full acting directorship position, whereas the CB did not. So address those two differences. Yes, Your Honor. I'll start with the second point. The fact is that Alliance has admitted that both the comparator and Dr. Ibrahim were both subject to the same standards. They were both considered executive management. The policy, among others, that Alliance maintains that both individuals violated was the executive management policy. So there's no distinction in terms of Alliance's own policies and the applicability to these two sets of conduct that turns on whether one was an acting center director versus a manager. Going back to your first point, Your Honor, as much as Alliance and the district court have attempted to link these two matters, the fact is there is no such link. Because when you look at the first matter, what you'll see is that the supervisor who spoke with my client, Juan Torres, conceded that this was really just an informal discussion and he made a recommendation that my client keep in mind the sensitivities that are associated with his position as acting center director, research advisor. But the only warning that was given to him was to not discuss the matter with this individual who was not his female subordinate. In fact, that would neutralize the subsequent conduct because he wasn't warned the first time. That's correct, Your Honor. And in fact, there was no link between the alleged subsequent conduct and anything that had to do with the first situation. There was no allegation. In the comparators, one was the acting director and one wasn't. That's correct. Two were disciplined by the same group of decision makers, including at least three overlapping individuals in this case. What's a company, you know, here you have a situation and maybe the, you know, the first incident happens and, you know, there's, you know, limited discipline, whatever. And then the company said, you know, then the second, then your client comes along and the company concludes, you know, maybe we blew it with the first one. We were too lenient. You know, that's not what, you know, the standards of our organization. And, you know, why can't the organization more or less say, you know, this is the second time we let the first person off too easily. We're going to have a tougher standard. You know, there's nothing in there that would suggest it's national origin or race or religious discrimination. Well, Your Honor, I respectfully disagree with that. When you look at the two sets of circumstances, I think Judge Ebell hit it on the head. The second set of circumstances with the comparator, in fact, were considerably more significant and serious. That's my point. They, you know, they're raising their standards. Well, there's been no testimony to the effect that you're suggesting, Your Honor, in that regard. And I think that given the fact that my client was not afforded any of the remedial opportunities that the Caucasian manager was afforded, including the ability to read a draft of the proposed discipline, to make changes to it, to form a rebuttal to it, to receive additional training by Alliance before going forward. And I would note that Alliance certainly didn't seem to have reconsidered its position when it later hired the Caucasian manager into a higher position at the company. So I don't think there's anything there in terms of second thoughts, in terms of how they handled the first situation. The accommodations that were afforded to the Caucasian manager were far more significant. Really, there was nothing relating to my client with the first situation other than just simply he was told to forget it and to move on. So there really is no link between these two situations, and any attempts by Alliance to claim that that's the difference between the two situations is without merit. I would also note, just for the record, that the Caucasian manager, in fact, was not furnished with the final disciplinary letter until approximately six weeks after he had been reinstated. And during that six weeks time, his female subordinate complained that he had, in fact, retaliated against her as a result of her having complained about the sexual harassment. The two items that you referred to, when I review those, and I have one of them in front of me, page 528 from the appendix, Larry Brown's memo, that is in the actual document, the one time that C.B. was told, was warned. And then the other passage was in the deposition testimony. And in that deposition testimony, it was referring to acts of retaliation that he preceded the complaint that had come in. So I did not see any evidence that you presented that there were acts of retaliation after C.B. had been disciplined. Thank you. Yeah, I can put my finger up. But I believe it was immediately the first day that C.B. was reinstated, which is approximately six weeks before the date of the final disciplinary letter that she complained of that retaliation. And I can look through on my rebuttal time here and see if I can point that out to you. I think the biggest issue here is that there is no link, again, between the first and second incidents that Alliance vaguely refers to in its termination notice. And I will point out for the court, the termination notice contains no specifics whatsoever relating to the basis for the termination. You'll see that the termination notice itself merely references the fact of these two what they call formal complaints. But there is there are no factual references in here as to what findings Alliance came up with, what information they considered. And there certainly was some confusion that Alliance admits to in the record regarding what, in fact, actually happened. They only had a partial collection of the text messages that issue would be non-subordinate. There was confusion created by another Caucasian manager who claimed that my client had asked out the non-subordinate on a date to dinner, which, in fact, was not the case. There's no reference to what the alleged verbal warning included, what the coaching included. The big picture here is that there really is no basis from which my client could reasonably challenge the termination decision, in part because there is no information in the termination notice itself. There's no documentation as to any prior warning. And the fact is that this company, which is dominated by Caucasian management, made the termination decision behind closed doors under the cloak of privilege by including their general counsel in the decision making process. In other words, under the second prong of the McDonnell Douglas framework, my client has not been given any realistic opportunity to be able to challenge or rebut the inference of discrimination because the defendant's explanation of its reasons have never been clear or reasonably specific. He has not been afforded a full and fair opportunity to demonstrate pretext. What evidence could we infer or jury infer national origin or religious discrimination? Your Honor, first, because my client is in the minority and he was otherwise qualified for his position under Perry and other cases, the fact that his his job responsibilities were not eliminated and he is that minority would at least create an issue in terms of prima facie case that this may have had something to do with with religion, national origin, other factors. Without seeing the information that the decision makers actually considered, we don't know what they considered, Your Honor. And so I can't call speculative. I mean, like you, Judge Tinkovich, you mentioned national origin and religion. But I saw no argument being made, no evidence on that subject. It seems to me those are kind of throwaways to your only real argument, which is gender. Your Honor, respectfully, they're not throwaways. We've detailed in the reply brief my client's views as to the mental models that Western society has created about the Middle Eastern man, about Muslims and that kind of thing, the feeling that he's an outsider based on all of these factors. We don't know on appeal is in my almost the equivalent of a throwaway. I mean, that's too late to try to resurrect a claim, a theory. Your Honor, respectfully, we've we've maintained those claims throughout. I think we did preserve it as we are in the reply brief. The the direct comparison with the Caucasian manager on the is being similarly situated, obviously, is a much more direct, stronger claim. But since we've never been left behind the curtain to know what it was that these decision makers actually considered, it is speculation. But we shouldn't have to speculate under these circumstances. And I'd ask to reserve the rest of my time, please. You may make. Thank you, counsel. For the alliance. Go ahead. Thank you, Your Honors. My name is Chris Atley. I am appearing on behalf of the defendant and Applebee Alliance for Sustainable Energy, which I'll refer to as Alliance during our argument today. Alliance requests affirmance of the order below that granted summary judgment on all four claims that have been appealed. We have several different arguments, but I would like to start off with a similarly situated argument to ensure that I have time to address those issues. I don't believe that the law in this area is unsettled. If anything, I think that it is settled. We do know that there are three prongs that must be met within the Tenth Circuit in terms of whether or not a comparator is similarly situated. In this case, we only dispute whether to whether CB was actually similarly situated with respect to the second and the third prong. The second prong is whether he was held to the same standards of conduct. Mr. Moretta claims that because there are generally applicable policies that he was, in fact, held to the same standards of conduct. But the unrebutted testimony below actually shows that Mr. Torres, Dr. Ibrahim's supervisor, specifically warned him in that January 25, 2018 meeting that there were certain sensitivities about Dr. Ibrahim, however, said under oath that Mr. Torres did not give him a verbal warning and that told him to forget it. So since this is summary judgment, don't we have to view that evidentiary conflict in the light most favorable to Dr. I do disagree with that, Judge Bacharach. The undisputed evidence is actually that Dr. Ibrahim was warned. Whatever distinction that Mr. Moretta is attempting to make is a distinction without any substantive difference. I'll read to you how Dr. Ibrahim testified at his deposition on the topic. He said, speaking of Mr. Torres, his claim that I did something inappropriate, that there's some sensitivities about it. You know, you're a center director. She's an admin. Just remember, there are certain sensitivities about you offering a rental car and asking her to a movie, even as friends, because you're a center director and she's an admin. That by itself is a warning. Later on, Dr. Ibrahim also specifically got into issues of what he needed to do going forward. And one of the things that he needed to do was that he was told not to contact Ms. Newell. He was also testified that he was spoken to about something that Dr. Ibrahim considered, quote, extremely offensive, close quote. He was also to set the bar and to be an example. That's a warning. Whether we want to call it a coaching or a warning doesn't matter. He was told not to do it. Significantly, for the purposes of the comparison, though, to CB, note that the warning that he was given for that conduct, the conduct that he exhibited toward Ms. Newell did not result in a written warning as it did with CB. I think we can all I think everyone here on this call can agree that what took place with CB was inappropriate and did merit a written warning. The conduct with Ms. Newell did not merit a written warning. It was just a verbal explanation, coaching, warning, whatever term we want to apply to it. And the only reason that Dr. Ibrahim ultimately lost his employment was because of the second incident that took place only two weeks later. And it is undisputed. How did how did the you know, this coaching of a of a relation, you know, acting director with an employee, you know, how would that warning transfer over to basically, you know, inappropriate comment at a cocktail party from, you know, somebody, you know, from halfway around the world? Yeah, I think the context is extremely important. In both instances, Dr. Ibrahim approached younger women, made comments to them that could be perceived as though that he were making advances toward them and he made them uncomfortable and resulted in complaints. The complaints, of course, are objective. They took place both in each case. Two women had concerns with the way that he raised topics. Obviously, with Ms. Newell, there's a question about going to the movies and having a rental car payment with Ms. Wood. It was questions referring to her body language and the vibe that she exhibited and that it must be difficult to be an attractive young female. Both of those incidents, evidence for judgment, inappropriate conduct and extremely and extremely important here show that Dr. Ibrahim didn't understand the impact of his actions on both. So is that obtuseness that connects the two situations? If is it with regard to whether CB is simply situated as a comparator? I think what a follow up of what Judge Bell asked earlier, what CB was warned about was extraordinarily egregious. I think all of us would agree with that. At least that's what I think. And I think by your own comment just a moment ago, the first incident with Ms. Newell wasn't of earth shattering consequence. Now, could two fairly mild incidents for Dr. Ibrahim, could those be considered similarly situated to CB who did not engage in a second incident, according to your argument? Contrary to Mr. Beretta's argument, but assuming that he only had one incident, but it was horrible. I mean, let's say he did something, you know, that that was was off the charts. Couldn't that be considered a similarly situated comparator, even though there was only one incident rather than two? I think the law is clear here, Your Honor, that no, they cannot be considered similarly situated because the circumstances are sufficiently different. What if he sexually assaulted someone? I'm sorry, one more time. What if CB sexually assaulted a subordinate female? Would that be considered similar to Dr. Ibrahim? And he still cannot be considered a similarly situated comparator? Well, again, at that point, then the egregiousness of conduct actually falls more on CB, who was not terminated. I think that one of the major issues that and perhaps the biggest distinction that we still have here is that Dr. Ibrahim refused to acknowledge that he had done anything wrong. So does CB on the on the bottom of the document, he says, this is all fabricated. This is none of this happened. I do disagree with that, Your Honor. What Dr. or what CB, excuse me, wrote was on a draft of his warnings where he said he wanted to bring forth additional information, which he did. The final warning he he did acknowledge he signed. He didn't have any reservations and final warning. And more importantly, the testimony is unrebutted from Alliance's 30B6 deposition where they said that he accepted responsibility for what he did. He owned up to his mistake and he wanted to do whatever he could possibly do not to not to have that same mistake happen again. And so because that testimony is unrebutted, there's nothing else that suggests CB did anything after this fact. And because of that situation, we know that there's a very different situation than Dr. Ibrahim, who in the appellate briefs before this panel right now, still refuse to accept any responsibility for misconduct. We know exactly what Dr. Ibrahim will do. He will continue to do the exact same thing that he did with Miss Newell and they did with Miss Wood because he has told us that fact. It is undisputed that he has continued to persist in his belief that what he did was perfectly appropriate. And it wasn't. He failed to recognize the impact of his decisions, which is exactly what the written termination discussed. What evidence did Alliance have that he would continue to do these things in the future? You said we know what he would do. He would do the same things. What evidence on that is in the record? To be clear, what I was trying to say is that we know that he would do that in the sense of the five of us who are engaged in this discussion know that because that was a part of the. We've got to limit ourselves to the record. Yeah. So I don't see anything in the record where Ibrahim says, I'm going to continue to do these things. That is correct. Judge, you know, I don't mean to overstate what's in the record. What he did do is refuse to accept that what he had done previously was wrong. If the company really thought this was the first instance was a serious infraction, why wasn't there any kind of written warning put in into his file? I don't believe the record directly addresses this issue, but I believe it's fair for us to interpret from what we do have. The reason there wasn't a written warning based upon the incident with Miss Newell is it wasn't serious enough to warrant the warning with Miss Newell. It was the fact that there was the second incident that took place only two weeks after he had been warned that merited more formal disciplinary issues. So really, we have to then say whether the second incident was serious enough, so much more serious than what CB did, that it justified him being fired and not CB or disciplined. I would suggest it's more than just looking at the seriousness. I think it does come down to what is their different levels of authority within the organization, as I mentioned before, what Mr. Torres said. But also, I think it's important to recognize that the two situations are completely different. Again, one instance is a situation where a person engaged in inappropriate conduct pointed out that the text messages that were going on between CB and the woman at issue in that instance were actually mutual. And in fact, sometimes the woman in that case was forwarding on her own text messages in that regard. And so you have to take into account the fact that the circumstances and the facts are different. In this case, we have a higher level individual who, again, refuses to accept that he did anything wrong and doesn't recognize the impact that his actions have. In addition, I'd like to address, unless any of the judges would like to continue talking about similarly situated, I do think it's really important for us to also recognize that we've never had a disputed issue of fact at any point in this proceeding, going all the way back to when the termination notice was issued. All of the essential facts have been admitted to in this case. Dr. Ibrahim has never shied away from the fact that he engaged in the exact conduct that the alliance considered to be inappropriate. And in fact, the only disputed issue, the fact that had been raised either at the summary judgment stage or before this panel was what was his subjective intent when he was making these comments to Ms. Newell and Ms. White. We have never questioned whatsoever what his subjective intent was. That's not an issue for the alliance to get into. What Alliance always had concern about was the objective impact that his actions had on two women who separately raised complaints about how he treated them. Did Ibrahim ask to be able to examine, cross-examine those two women? Have them brought in before the decision-making committee and questioned them? I am not aware that he did, Your Honor, but I'm speaking there off of my recollection. I don't know if I have a specific site that I can provide to you in that regard. And then finally, I think it's important for us all to recognize that, and this goes to some of the questions that were asked of Mr. Moretta, the evidence in this case is completely bereft of anything suggesting that national origin played any role whatsoever in Dr. Ibrahim's termination of his employment. The same is the case for his religion. The mental models that were raised on the reply brief does not provide anything to suggest that the reasons for the termination of employment were for anything other than what was exactly submitted. So when we look at the pretext stage of this inquiry, we have nothing to get beyond the fact that there has been a legitimate non-discriminatory reason that has been provided. The legitimate non-discriminatory reason has been the same since day one in this matter. And there has never been anything to suggest at all that those two protected categories played any role whatsoever in Alliance's decision-making. The same is true with respect to sex discrimination, where, in fact, the only comparator that's been provided is himself a male. And so we have no evidence to suggest that a female who has acted in the exact same way would have been treated any differently. In fact, if the female center director had approached a male administrative assistant, noting that she did not have a significant other, that she would like to pay for the rental car, and that she would like to go to the movies, that that also would have raised the certain sensitivities that we've talked about. And so because of that, the other three claims have never had any support in this case. I believe I've addressed the issues that I have. If there's anything else with the panel, I'm happy to address. Otherwise, I'll cede my time to Mr. Moreno. I have a question, Mr. Adelaide. You all have discussed it today, but there's extensive discussion in the briefing about stage one of Donald Douglas. You've argued that there was a fourth element for a prima facie case, proof that the job has not been eliminated. Mr. Moreno refers to the Plotky case, where a unanimous panel specifically said that elimination of a job is not a requirement when the defendant is terminated for unsatisfactory conduct. You've referred to a prior case, Kendrick and the like, but Plotky has been relied on several times for that same point. Do you concede that there is no element here? Since, as you just alluded to, the consistent explanation is that he was terminated for unsatisfactory conduct, not because of a riff. We do concede that fact, Your Honor. Thank you. Thank you for your candor. Counsel, thank you. Your time's expired. There's some rebuttal time for Mr. Moreno. Thank you. Following up on the earlier point, I direct the court to Volume 4, page 731, which references the fact that when C.B. returned to work, his female subordinate immediately expressed concerns at lines 23 to 25 of page 119 on page 731 of the record that he was openly discussing the investigation. I would also refer the court to Volume 3, page 530, in which it references the fact that multiple, six employees said that they had heard C.B. joking about sexual subjects and making sex-based comments about women. I think the court picked up on the fact that, and I see my time is up. May I have some additional time, Your Honor? Finish your thought there, please. Thank you. Yeah, I think the court picked up on the fact that it was my brother, Counsel, who was testifying, in fact, for things that C.B. never referred to. One other final point, the court asked a question about whether my client was allowed to essentially cross-examine these witnesses. He was not. In fact, he was told not to communicate with these individuals at all. And I'll also point out one final note that the delegate is not a witness in this case, Your Honor. So any testimony as to the purported impact that my client's discussion with her had is going to be entirely hearsay. Thank you, Counsel. Appreciate your arguments. Your excuse on the case shall be submitted.